UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

KARMIK GRANT-BYAS,

                          Petitioner,          23-cv-3628 (JGK)

        - against -                            MEMORANDUM OPINION
                                               AND ORDER
SUPERINTENDENT OF COXSACKIE
CORRECTIONAL FACILITY,

                          Respondent.
_____

JOHN G. KOELTL, District Judge:

    Karmik Grant-Byas brings this pro se petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was
convicted after a jury trial in the New York State Supreme
Court, New York County, of two counts of sex trafficking, see
N.Y. Penal Law § 230.34(5)(a), and one count of promoting
prostitution in the third degree, see id. § 230.25. The
petitioner was sentenced principally to seven to 21 years'
imprisonment on each of the sex trafficking counts, to run
consecutively, and to 28 months' to seven years' imprisonment on
the count of promoting prostitution, to run concurrently with
the sentences imposed on the other counts. The petitioner argues
that: (1) the trial court's final supplemental jury instructions
with respect to the sex trafficking charges were erroneous; (2)
the trial court's alleged denigration of the petitioner's trial
counsel denied him a fair trial; (3) the petitioner was denied
counsel of his choice when the trial court disqualified his

original counsel based on a conflict of interest; (4) the trial court erred in denying the petitioner's for-cause challenge to a prospective juror, which forced him to use a peremptory challenge; (5) the trial judge was biased against the petitioner; (6) the petitioner's sentence was excessive; and (7) the petitioner received ineffective assistance of counsel. For the reasons explained below, the petition for a writ of habeas corpus is **denied.**

## I.

The record reflects the following relevant facts.

### A.

The New York County Grand Jury charged the petitioner with four counts of sex trafficking and one count of promoting prostitution in the third degree. S.R. at 6–11.[1] The petitioner was alleged to have trafficked four women during varying time frames between May 2012 and November 2013: Jeniffer Encarnacion and Christina Nikitich, who were involved with the petitioner for longer periods of time, and Patricia Munguia and Kaylien Fernandes, who were involved with the petitioner for shorter periods of time. See Tr. at 7.

---

[1] Record citations preceded by "S.R." refer to the state record documents collected in ECF Nos. 18-1 to 18-4. Record citations preceded by "Tr." refer to the trial transcripts collected in ECF Nos. 18-6 to 18-7. Record citations preceded by "V.D." refer to the voir dire transcript, collected in ECF No. 18-5. Citations to all other proceedings are preceded by the date of the proceeding. E.g., "Jan. 19, 2016 Tr."

In July 2012, police officer Gregory Dolan arrested Encarnacion for prostitution. Id. at 33-34. Dolan noticed burn marks on Encarnacion's forearm. Id. at 37. At the precinct, police detective Mark Woods interviewed Encarnacion. Id. at 158-60. Woods suspected sex trafficking and obtained a search warrant to examine the contents of Encarnacion's phone. Id. at 161. Investigators found thousands of text messages between Encarnacion and the petitioner, as well as with Nikitich. Id. at 46-48, 164-206, 234-45. The police initiated a broader investigation of the petitioner. Id. at 245. Thereafter, beginning in June 2013, the police obtained eavesdropping warrants for Encarnacion's, Nikitich's, and the petitioner's phones. Id. at 502-03. These warrants were authorized by the judge who would eventually also serve as the trial judge on the petitioner's case. See Jan. 19, 2016 Tr. at 53-55, ECF No. 18-5.

The investigation revealed that the petitioner was a pimp and that Encarnacion and Nikitich had worked for the petitioner since at least May 2012. S.R. at 307-08; Tr. at 164-84. Encarnacion and Nikitich ran advertisements in "backpage.com" offering their escort services for sale. Tr. at 225-30; S.R. at 309-14, 324-29. Bank accounts under the petitioner's sole control received tens of thousands of dollars in cash deposits from 2012 to 2013, as well as occasional deposits of checks made

out to Nikitich or Encarnacion. S.R. at 331-41. Text messages
between the petitioner and the two women indicated that the
defendant physically and verbally abused Encarnacion and
Nikitich on multiple occasions, see Tr. at 238-40, 656-63; S.R.
at 364-65, 382-90; and that the petitioner directed Encarnacion
to work even when Encarnacion was sick or in "excruciating
pain," see Tr. at 241-44.

In September 2013, Encarnacion informed the petitioner that
Fernandes was interested in joining the prostitution ring. See
S.R. at 360-62. Over the next two and a half months, the
petitioner and Fernandes exchanged over 160 communications by
phone. Id. at 363. On October 14, 2013, the petitioner called
Fernandes to tell her that it was time for her to wake up and
get ready. Id. at 370.

In October 2013, the petitioner texted with Munguia, who
was then in Michigan, asking if Munguia was "ready for this life
babygirl." Id. at 371. On November 2, 2013, the petitioner
arranged airfare for Munguia to travel to New York City, and
Munguia arrived in New York City later that day. Id. at 372-76.
Over the next few days, Munguia went on dates, with the
petitioner checking up on her to make sure that she "received
[her] money." Id. at 377-81. On the morning of November 13, the
petitioner and Munguia argued, and the petitioner beat Munguia.

4

See id. at 391-94; Tr. at 406-10. Munguia promptly left for the airport and returned to Michigan. Tr. at 410-11; S.R. 395-96.

On December 11, 2013, the petitioner was arrested. Tr. at 120. Encarnacion and Nikitich were still working with the petitioner at the time, see id. at 521-23, 619, and they refused to cooperate with the prosecution, see id. at 261-62, 331-32.

**B.**

On December 12, 2023, the petitioner was arraigned before the trial court and was represented by retained counsel Robert Walters. See S.R. at 564. The prosecution moved to disqualify Walters for a conflict of interest because Walters also represented two of the petitioner's alleged sex trafficking victims, Encarnacion and Nikitich, on their open cases. Id. at 564-65. The court observed, "That won't work in this case." Id. at 565. In response, Walters asked for an opportunity to research the issue and stated that the petitioner was "entitled to counsel of his choice." Id. The court replied that the petitioner "ha[d] to have conflict-free counsel." Id. The court explained that Walters had a "clear conflict" that "cannot happen." Id. at 566. Walters responded, "I understand that," and asked that the petitioner be given "an opportunity to get counsel of his choice." Id. The court asked the petitioner when he could do that; Walters answered, on the petitioner's behalf,

5

"[i]n the next day or two." Id. The court accordingly adjourned
the proceeding to December 16, and Walters stated that the
petitioner would appear that day with a new lawyer or the court
could appoint one. Id. at 567.

On December 16, however, Walters appeared again for the
petitioner because the petitioner had not retained new counsel.
Id. at 570. Walters represented that he wanted to explore
whether the potential conflict was waivable, either by the
petitioner or by Walters's two other clients, Encarnacion and
Nikitich, and whether the conflict was "so severe that it should
override" the petitioner's right to counsel of his choice. Id.
The prosecution argued that the conflict could not be "more
obvious," because Walters was currently representing Encarnacion
and Nikitich in open cases on prostitution-related offenses, and
the petitioner was accused of trafficking these two women. Id.
at 571. Walters replied that the charges pending against
Encarnacion and Nikitich were misdemeanors—"absolutely d[e]
minimus"—and that the petitioner should be allowed to make up
his own mind about waiving the potential conflict. Id. at 572.

The court agreed with the prosecution, stating that it
"d[id not] see how [Walters] can continue." Id. First, the court
explained that Encarnacion and Nikitich could have their
prostitution convictions expunged under state law if they could

6

prove that those convictions were the result of sex trafficking. Id. The court suggested that the petitioner wanted Encarnacion and Nikitich "not to testify against him," and that there was a risk that the trial would be unfair if Walters were permitted to continue. Id. at 573. The court opined that it was "impossible" and "untenable" for Walters to represent the petitioner, given that Walters "represented the prostitutes involved in this case, two out of the four that are the basis of this case." Id. at 572-74.

The court then asked the petitioner whether he wanted to hire another lawyer. Id. at 574. Walters responded, on the petitioner's behalf, that the petitioner could not afford counsel. Id. When the court questioned that assertion, Walters explained, "[H]e doesn't have money to hire a counsel. Or else one would have been here." Id. The court replied, "He wants you." Id. At that point, the petitioner spoke up: "I want a lawyer, period." Id. The court adjourned the proceeding to the next day to give the petitioner time to obtain counsel. Id. at 575. The petitioner was subsequently represented by Howard Greenberg (hereafter, "defense counsel" or "counsel").

### c.

During jury selection, prospective juror Lisa Bates stated, in response to the jury questionnaire, that she was the victim

7

of a crime at the courthouse the week before, when her wallet was stolen. V.D. at 147–48.

The prosecutor then questioned Bates. During that questioning, Bates noted that it had been "a heck of a jury duty so far, between the wallet going missing and the ensuing chaos and . . . this process." Id. at 175. The prosecutor asked Bates whether she would be able to "put that aside and just focus on the evidence" if she were selected as a juror. Id. Bates replied, "I would like to." Id. When the prosecutor asked whether Bates could assure that she would, Bates responded, "I would do my best." Id.

Defense counsel sought to remove Bates for cause, but failed to explain why. See id. at 202. The court denied the petitioner's challenge for cause, and defense counsel subsequently used a peremptory challenge to disqualify Bates. Id. at 205.[2] Bates did not sit on the jury. At the conclusion of jury selection, the court asked whether the defense was satisfied with the selected jury, and counsel said "yes." Id. at 275.

---

[2] Throughout this exchange, defense counsel appeared to confuse Bates with a different prospective juror. See V.D. at 202–03.

**D.**

During pre-trial proceedings and throughout the trial, the court found defense counsel's conduct objectionable and unprofessional, and the court admonished defense counsel accordingly. Some examples are below.

At a pre-trial conference, defense counsel expressed his "professional opinion" that sex trafficking should not be a crime. Jan. 19, 2016 Tr. at 10. Counsel further characterized the prosecution's expert on sex trafficking as a "so-called expert" who was, in counsel's view, "incompetent." Id. at 29.

At that same conference, defense counsel sought the judge's recusal on two grounds. First, according to defense counsel, the judge had previously "tried to drive a wedge" between counsel and the petitioner, and that the judge had generally exhibited "hostility" toward the petitioner. Id. at 53. Second, defense counsel argued that the judge should not be permitted to preside over the trial because the judge had "repeatedly authorized" the eavesdropping warrants during the investigative phase of the case. Id. at 53-54. On the first ground, the court noted that nothing in the record supported defense counsel's allegations, and further stated, "I have no interest in this case one way or the other." See id. at 54-55. On the second ground, the court explained that "there is no prohibition of a trial judge doing

9

applications for warrants, as long as there is probable cause;
and I've been doing warrants like this for years, so there is no
issue there." Id. at 55. Accordingly, the court denied the
recusal motion, describing the request as "laughable." Id. at
55-57.

During jury selection, defense counsel questioned
prospective jurors aggressively. At one point, for example,
counsel stated that a prospective juror "looked as if there was
a skunk on the loose in the room." V.D. at 94. The court asked
counsel if he could "be a little more respectful to these
jurors" and instructed counsel to refrain from badgering the
prospective jurors. Id. at 98. Nonetheless, counsel continued
with his aggressive questioning, and eventually some prospective
jurors complained. See id. at 104-05. In response to these
complaints, the court stated that defense counsel "has a right
to ask questions," that counsel was "a very experienced lawyer,"
and that the jurors would "have to give his client a fair trial"
even if they did not like counsel. Id. at 105-06.

During his opening statement, defense counsel attacked the
prosecution and used inappropriate language. For example,
counsel twice chastened the prosecutors for having the "balls to
stand here and say . . . that a woman can't consent to the

lifestyle of her own choosing"—over an objection that the court sustained. Tr. at 22–23.

During his examination of witnesses, defense counsel's tactics included "screaming at" and "badgering" witnesses. Id. at 273—75. On one occasion, the court called a break, with the jury not present, to address defense counsel's "yelling" at and "badgering" of a witness. Id. at 274. In response, defense counsel asked, "And what's your ruling regarding the deci[bel] number for my voice? What would it be? Do I have to whisper? Do I have to kowtow my tone[?]" Id. at 275–76.

During his cross-examination of Munguia, defense counsel asked Munguia irrelevant personal questions in an apparent attempt to "humiliate" her. Id. at 457–59. Counsel's questioning brought Munguia to tears. Id. at 459. After this cross-examination, the court remarked to defense counsel that the petitioner "was laughing hysterically. He is laughing now and smirking. You can both act how you see fit. Of course I tell the jury the way the defendant looks and his behavior is not evidence." Id. at 473.

During the parties' examination of witnesses, defense counsel moved for a mistrial on three occasions, criticizing the court's conduct. On the first occasion, defense counsel argued that the court's behavior—certain comments that the court made

during counsel's cross-examination of witnesses, the court "refusing to take sidebars" when reprimanding counsel "loud enough for the jury to hear"—may have prejudiced the jury against the petitioner. See id. at 468-71. The court disputed defense counsel's characterization of its conduct and denied the motion. See id. at 471-72. On the second occasion, counsel accused the court of "choosing to do the prosecutors' work for them" during the examination of witnesses. Id. at 563-64. The court again disputed defense counsel's account, stating, "I'm not a potted plant. I have a right to clarify questions that are confusing and misleading." Id. at 564. On the third occasion, defense counsel claimed that the judge "kept shaking [her] head from side to side" during counsel's cross-examination of a witness. Id. at 613. The court replied, "I did not." Id.

During the charge conference, defense counsel stated that the state of the law regarding sex trafficking was "pathetic." Id. at 834. When the court explained that it had been affirmed in a different sex trafficking case, counsel responded, "[S]ince there virtually is no law you ought to make some law. That is all I have." Id. at 834-35.

In closing, the defense argued—as it had throughout the trial—that the victims had voluntarily joined the petitioner's prostitution ring because the victims enjoyed the lifestyle. See

12

id. at 845–96. Defense counsel argued that, given the "economic conditions," it made sense that the victims decided to engage in prostitution, and further that "we are all in a sense prostitutes." Id. at 894–95. At one point during defense counsel's closing, the court instructed the jury: "The personal opinions of the lawyers is irrelevant to the case. . . . It's the jury's evaluation of the evidence, the whole record, applying the law that should determine the guilt or non guilt of a defendant . . . . It's not a personality contest, it's not a contest between strateg[ies] so please understand that, no matter what is said during summation." Id. at 888. Defense counsel objected to these remarks. Id. at 888–89. The court responded, "I stand by every word I said." Id. at 889.

As part of its jury charge, the court explained to the jury that the jury should not infer from the court's rulings on evidentiary arguments and objections any views the court might hold as to the petitioner's guilt or non-guilt. Id. at 944. The court further instructed that "the trial is not a personality contest. The trial strategy, tactic of an attorney shouldn't affect your verdict. Sometimes trials can get pretty heated as it did in this case. Sometimes lawyers say things . . . and I had to say things in making rulings that is not evidence. Please

decide this case only on the evidence under the law that applies." Id. at 946–47.

While the jury was deliberating, defense counsel again moved for a mistrial. Counsel pointed to an article, published in the New York Post, that reported that the court "was rolling its eyes, looking aghast and shaking its head" during his closing argument. Id. at 1012–13. The court responded that those allegations were "not true" and denied the motion. Id. at 1013.

**E.**

In its instructions to the jury before deliberations began, the court explained that "a person is guilty of sex trafficking if he intentionally advances or profits from prostitution by using force or engaging in any scheme, plan, or pattern, to compel or induce the person being patronize[d] to engage in prostitution by means of instilling a fear in the person that if the demand is not complied with, the defendant will do, will either cause physical injury or serious physical injury." Id. at 957–58.

The court applied that definition to the four alleged victims in the case, explaining that the prosecution had to prove three elements beyond a reasonable doubt: first, that "the defendant profited from prostitution" during the relevant time period; second, that "he did so by using force or engaging in a

14

scheme, plan, or pattern to compel or induce" the victim "to continue to engage in prostitution by instilling in her fear that if she didn't comply, he would cause physical injury or serious physical injury"; and third, that he "did so intentionally." Id. at 959–61. The jury then retired to begin its deliberations. Id. at 968.

Fifteen minutes later, the jury sent a note asking for "the written law." Id. at 969. Because the defense refused to consent to providing the jury with written instructions, the court was unable to give the jury the written law. Id. The court explained to the jury that it could read the law for the jury again if the jury would like it to do so. Id. The jury requested that the court read the law on sex trafficking to the jury again. Id. The court did so "slowly." Id. at 977–78. After a few more hours of deliberations, the court excused the jury for the weekend. Id. at 981–82.

On Monday, the jury sent a note asking if the court could "speak to whether or not the acknowledgment of fear on the part of the girls has any bearing or weighing on our opinions." Id. at 999. The court stated that the best answer to that question was to "read the statute again" to the jury, and defense counsel agreed. Id. at 999–1000. The court did so "really slowly, as slow as [it could] go." Id. at 1001–03.

15

The next day, after a day and a half of deliberating, the jury reported that it had come to a verdict on two charges but was at an impasse on the remaining charges. Id. at 1021. The court asked the jury to continue deliberating. Id. at 1023-24.

The jury then sent back a note, which stated: "We have a fundamental disagreement over the interpretation of the law and we do not believe we can reach a unanimous verdict. We believe we have exhausted the discussion as this disagreement has been consistent from the beginning of deliberations." Id. at 1024. The note continued, "If you do not agree with our decision we ask that we have the law reread to us so we may take notes on the exact wording and structure." Id. Defense counsel opposed the jury's request to take notes on the wording and structure of the law. Id. at 1025. The court suggested to the parties that it would reread the definition of sex trafficking to the jury and provide the jury with the written law if both sides agreed. Id. at 1025-26. However, defense counsel did not agree to that, and instead asked the court to "read the whole thing in a monotone" and not to allow note taking. Id. at 1026-27. The court observed that the jury was "having trouble getting the statute," and that it thought that giving the jury the statutory language "would help clarify their job." Id. at 1028. But defense counsel continued to refuse to consent, and the court therefore read the

16

law to the jury again and did not let the jurors take notes. See
id. at 1029-34.

A few hours later, the jury sent a note requesting: the
"legal definition of force"; a response as to "whether a single
incident of force is sufficient for a determination of guilt";
and an answer as to whether the law is "broken up into two
parts? By force or everything else in the law," which the jury
remembered as "engaging in scheme, plan or pattern to compel or
induce, by instilling fear and subsequently causing or
threatening physical harm"; and direction on whether the jury
was "allowed to speculate regarding the motivations of any of
the subjects?" Id. at 1039; see also S.R. at 81.

The court brought the jury back to the courtroom and
instructed the jury once more (the "final supplemental jury
instruction"). The court explained, in relevant part, that the
sex trafficking law was "in the alternative. . . . You can
either use force, . . . or engage in a scheme, pattern, plan to
compel or induce the prostitute to continue to engage in
prostitution by instilling fear that if not complied with, he
will cause physical injury or serious physical injury." Tr. at
1044. The court then repeated: "It is in the alternative. Either
force or that long phrase which you are right, it is not causing
physical injury however it is instilling in the person a fear

17

that if not complied with he will cause serious injury or physical injury." Id. at 1044-45.

As to whether a single incident of force was sufficient for a determination of guilt, the court responded that a single incident "can be sufficient but it is the element of force that must be proved beyond a reasonable doubt or that other phrase and the two other elements have to be proved beyond a reasonable doubt." Id. at 1045-46.

**F.**

Later that afternoon, on February 9, 2016, the jury announced that it had reached a verdict. Id. at 1047. The jury found the petitioner guilty of two counts of sex trafficking as to Nikitich and Encarnacion, and not guilty of two counts of sex trafficking as to Fernandes and Munguia. Id. at 1048. It also found the petitioner guilty of promoting prostitution. Id.

On May 16, 2016, the court sentenced the petitioner on each of the two sex trafficking counts to indeterminate terms of seven to 21 years of imprisonment, to run consecutively. See May 16, 2016 Sentencing Tr. at 27, ECF No. 18-7. On the promoting prostitution count, the court sentenced the petitioner to an indeterminate sentence of two-and-one-third years to seven years of imprisonment, to run concurrently with the sentences imposed on the other two counts. See id.; see also S.R. at 4.

18

**G.**

The petitioner appealed his conviction to the Appellate Division, First Department, of the New York State Supreme Court. The petitioner argued, in relevant part, that the trial court's final supplemental jury instruction erroneously suggested that the jury could convict the petitioner of sex trafficking without finding that his conduct compelled the victims to engage in prostitution, see S.R. at 433-42; that the trial court's denigration of defense counsel violated the petitioner's due process right to a fair trial, see id. at 442-50; that the trial court violated the petitioner's right to counsel of his choice by disqualifying the petitioner's initial trial counsel, see id. at 450-55; that the trial court erred in denying the petitioner's challenge for cause to prospective juror Bates, see id. at 456-60; and that the petitioner's sentence was excessive and based on crimes for which the petitioner was acquitted, see id. at 461-66.

In January 2022, the Appellate Division affirmed the judgment, as relevant to this petition. See People v. Grant-Byas, 161 N.Y.S.3d 61 (App. Div. 2022). First, the court held that the trial court's "supplemental jury instruction on the element of sex trafficking (see Penal Law § 230.34[5][a]) that involves the use of force to compel or induce a person to engage

19

in prostitution correctly stated the law and was not confusing."
Id. at 62. In any event, the court continued, any error was
harmless in view of the "overwhelming evidence" that the
defendant forcibly compelled the victims' prostitution activity.
Id.

Second, the Appellate Division held that the trial court's
behavior toward defense counsel did not warrant reversal. Id.
The court explained that the court's "caustic" comments were
"permissible responses in a case where throughout the trial
counsel behaved poorly, ignored the court's rulings, badgered
witnesses, wasted time, and delivered a summation that was
replete with irrelevant comments, inappropriate references, and
misstatements of law." Id. at 63.

Third, the court concluded that the petitioner failed to
preserve his claim that he was deprived of his right to counsel
of his choice when his original counsel was disqualified based
on a conflict of interest. Id. The petitioner's original
attorney, the court observed, "made no protest other than
expressing a vague desire to look into whether the conflict
could be waived," and the petitioner himself never requested to
continue with the conflicted attorney. Id.

Fourth, the court found the petitioner's claim that the trial court wrongly denied his for-cause challenge to prospective juror Bates was unsupported by the record. <u>Id.</u>

Fifth, the court "perceive[d] no basis for reducing the sentence." <u>Id.</u>

The petitioner sought leave to appeal to the New York Court of Appeals, raising all of the issues presented in his Appellate Division brief. S.R. at 556-61. In March 2022, then-Chief Judge DiFiore of the Court of Appeals denied the petitioner's application. <u>Id.</u> at 583.[3]

In this Court, the petitioner has filed a <u>pro se</u> petition for habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. The petitioner raises the same five claims that he raised in his direct appeal, as well as two additional arguments.

## II.

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the state court's decision "was contrary to, or involved an unreasonable application

---

[3] The petitioner also brought a motion in the trial court to vacate his conviction pursuant to N.Y. CPL § 440.10, raising claims that he does not raise in this petition. S.R. at 588-615. In July 2020, the state court summarily denied the motion. <u>Id.</u> at 620-32. In March 2021, the Appellate Division, First Department, denied leave to appeal. <u>Id.</u> at 836.

of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); see also Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006); Muir v. New York, No. 07-cv-7573, 2010 WL 2144250, at *3 (S.D.N.Y. May 26, 2010).

A state court decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result. Williams v. Taylor, 529 U.S. 362, 405 (2000).[4]

A state court decision involves "an unreasonable application of . . . clearly established Federal law" when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . ." Id. at 407-08. To meet that standard, the state court decision must be "more than incorrect or erroneous . . . . [It] must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75

---

[4] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

(2003). "[I]t is well-established in [this] circuit that the objectively unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003); see also Muir, 2010 WL 2144250, at *4.

A writ for habeas corpus shall not be granted unless the petitioner "has exhausted the remedies available" in state court. 28 U.S.C. § 2254(b)(1)(A); see also Grey v. Hoke, 933 F.2d 117, 119 (2d Cir. 1991). This means that "a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition," and the state court must be "fairly apprised . . . of the factual and legal premises underlying the claim." Grey, 933 F.2d at 119–20.

Because the petitioner is proceeding pro se, his petition is "read liberally and should be interpreted to raise the strongest arguments that [it] suggest[s]." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996); see also Muir, 2010 WL 2144250, at *4.

### III.

### A.

The petitioner first contends that the final supplemental jury instruction given by the trial court with respect to the

23

sex trafficking charges was erroneous, and that this error violated the petitioner's federal due process rights. According to the petitioner, the court, in giving this instruction, did not adequately explain that the sex trafficking statute, N.Y. Penal Law § 230.34(5)(a), required the jury to find that the defendant's conduct—whether through the use of force or threat of coercion—compelled the victims to engage in prostitution.

"[T]o obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001). Federal courts "must of course defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional." Id. at 123 n.4. "Even if there is some ambiguity, inconsistency, or deficiency in the instruction, such an error does not necessarily constitute a due process violation." Waddington v. Sarausad, 555 U.S. 179, 190 (2009). Where an erroneous jury instruction is alleged, the question for courts is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting

24

Cupp v. Naughten, 414 U.S. 141, 147 (1973)). In answering this question, "the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Id. (quoting Cupp, 414 U.S. at 147).

In this case, the Appellate Division held that the trial court's final supplemental jury instruction correctly stated New York law. Grant-Byas, 161 N.Y.S.3d at 62. The final supplemental jury instruction, the Appellate Division found, was "essentially the same as the court's main charge and the Criminal Jury Instructions," which are the model instructions provided to the New York state trial courts for guidance. Id. The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005). "When a state court holds that a jury charge comports with the law of that state, 'we are not empowered to second-guess that ruling.'" Mojica v. Fischer, 254 F. App'x 28, 30 (2d Cir. 2007) (quoting DiGuglielmo v. Smith, 366 F.3d 130, 137 (2d Cir. 2004)).

Moreover, the petitioner was not prejudiced by any alleged confusion potentially caused by the final supplemental jury instruction. To start, as the Appellate Division found, there

25

was "overwhelming evidence that [the petitioner] forcibly
compelled his victims' prostitution activity." Grant-Byas, 161
N.Y.S.3d at 62. In addition, viewing the challenged instruction
"in the context of the instructions as a whole and the trial
record," Estelle, 502 U.S. at 72, the court's overall
instructions could only be understood as requiring the jury to
find that the petitioner's use of force actually compelled the
prostitution in order to convict the petitioner. Indeed, the
trial court repeated the model instruction for the sex
trafficking charges on multiple occasions. See Tr. at 957-58
(setting forth the applicable model instruction, including the
three elements of the statute); id. at 977-78 (same); id. at
1001-03 (same). Even the prosecutor observed, in summation, that
the jury had to find that the petitioner used force or the
threat of force to compel each victim to engage in prostitution
in order to convict. See id. at 897 ("[T]his case is about how
this defendant ran his prostitution business through his scheme
to use force and the threat of force to induce Christina
Nikitich, Jeniffer Encarnacion, Kaylien Fernande[s], and
Patricia Munguia to sell their body for money to earn him his
money."); id. at 901-02 ("[W]hat we have to prove is that the
defendant's plan or scheme, was to compel [the four alleged

26

victims] to engage in prostitution by instilling a fear . . . if they didn't he would hurt them . . . .").

Accordingly, the petitioner has failed to show that the final supplemental jury instruction was erroneous, let alone that the challenged instruction "by itself so infected the entire trial that the resulting conviction violate[d] due process." Estelle, 502 U.S. at 72. The final supplemental jury instruction therefore was not contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1).

### B.

Second, the petitioner argues that the trial court's denigration of defense counsel denied the petitioner's due process right to a fair trial. The petitioner claims that the trial court, among other things, criticized defense counsel at sidebars loudly enough for the jury to hear, admonished counsel in open court, and otherwise expressed hostility toward counsel with eye rolls and scornful looks, all of which prejudiced the petitioner with the jury.

"To establish that a judge has engaged in misconduct sufficient to warrant habeas relief, [the] petitioner must show that the judge demonstrated 'such a high degree of favoritism or antagonism as to make fair judgment impossible.'" Wright v.

Conway, No. 09-cv-2967, 2009 WL 3273901, at *13 (E.D.N.Y. Oct.
9, 2009) (quoting Liteky v. United States, 510 U.S. 540, 555
(1994)); see also, e.g., Williams v. Ercole, No. 05-cv-4242,
2009 WL 3837307, at *7 (E.D.N.Y. Nov. 17, 2009) (same).[5] The
question is not "whether the trial judge's conduct left
something to be desired, or even whether some comments would
have been better left unsaid." United States v. Pisani, 773 F.2d

---

[5] The respondent argues that there is no case where the Supreme Court has
addressed the specific issue raised by the petitioner: whether the trial
court's conduct toward defense counsel made a fair trial impossible, thus
depriving the petitioner's right to due process. As the Supreme Court has
explained, the meaning of the phrase 'clearly established Federal law, as
determined by the Supreme Court of the United States'" in 28 U.S.C.
§ 2254(d)(1), "refers to the holdings, as opposed to the dicta, of [the
Supreme Court's] decisions as of the time of the relevant state-court
decision." Williams, 529 U.S. at 412. "[I]f a habeas court must extend a
rationale before it can apply to the facts at hand, then by definition the
rationale was not clearly established at the time of the state-court
decision." White v. Woodall, 572 U.S. 415, 426 (2014).
     In Liteky, the Supreme Court addressed the standard for recusal of a
federal judge pursuant to 28 U.S.C. § 455(a), which requires a judge to
"disqualify himself in any proceeding in which his impartiality might
reasonably be questioned." 510 U.S. at 541. In relevant part, the Supreme
Court held that "judicial remarks during the course of a trial that are
critical or disapproving of, or even hostile to, counsel, the parties, or
their cases" will support a partiality challenge under the statute "if they
reveal such a high degree of favoritism or antagonism as to make fair
judgment impossible." Id. at 555. As the respondent points out, the Liteky
Court did not address the issue in the context of a constitutional due
process claim like the one raised by the petitioner in this case.
     However, courts in this Circuit have applied Liteky in the habeas
corpus context. See, e.g., Wright, 2009 WL 3273901, at *13; Ercole, 2009 WL
3837307, at *7; Reid v. Phillips, No. 04-cv-1338, 2004 WL 1920218, at *4
(S.D.N.Y. Aug. 26, 2004). And the more general principle that due process
guarantees a litigant a fair trial before a neutral decisionmaker is well-
established in the Supreme Court's jurisprudence. See, e.g., Withrow v.
Larkin, 421 U.S. 35, 46 (1975) ("[A] fair trial in a fair tribunal is a basic
requirement of due process.").
     It is therefore at least unclear whether, as a threshold matter, the
petitioner has identified a "clearly established Federal law, as determined
by the Supreme Court," that the trial court's conduct allegedly violated. In
any event, even applying the analysis adopted by courts in this Circuit for
claims like the one at bar, the petitioner's claim fails on the merits.

397, 402 (2d Cir. 1985). Rather, "[t]he test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, . . . or whether it appeared clear to the jury that the court believed the accused is guilty." United States v. Amiel, 95 F.3d 135, 146 (2d Cir. 1996).

The trial court's behavior toward defense counsel in this case did not violate the petitioner's right to a fair trial. As the Appellate Division found, the trial court's admonitions against counsel were given primarily at the sidebar—outside the presence of the jury—and were occasioned by counsel's actions: throughout the trial, "counsel behaved poorly, ignored the court's rulings, badgered witnesses, wasted time, and delivered a summation that was replete with irrelevant comments." Grant-Byas, 161 N.Y.S.3d at 62–63; see also Reid v. Phillips, No. 04-cv-1338, 2004 WL 1920218, at *4 (S.D.N.Y. Aug. 26, 2004) (rejecting the habeas petitioner's argument that the trial judge's remarks, "most of which were [made] outside the presence of the jury," influenced the verdict).

Moreover, to the extent that the petitioner claims that the trial court exhibited hostility toward defense counsel in open court, any prejudicial effect of the court's purported conduct was sufficiently mitigated. As explained above, the trial

29

court's negative comments to or about defense counsel cannot
reasonably be "viewed as compromising the fairness of a trial"
because "they were provoked by defense counsel himself."
Martinez v. Kelly, No. 01-cv-11570, 2005 WL 1863854, at *6
(S.D.N.Y. Aug. 4, 2005); see also Pittam v. Ecole, No. 09-cv-
775, 2015 WL 1886964, at *9 (E.D.N.Y. Apr. 24, 2015) (finding
that the trial judge's "harshly worded" comments were "necessary
to correct misstatements or mistakes by defense counsel," and
thus did not deprive the habeas petitioner of a fair trial).
Also, the trial court specifically instructed the jury that the
court's admonitions against counsel should not indicate any view
that the court had about how the jury should reach its verdict.
See Martinez, 2005 WL 1863854, at *6 ("[T]he prejudicial effect
of a trial court's comments can be cured by the court's
cautionary instruction to the jury."); see also Pisani, 773 F.2d
at 404 (explaining, in the context of a criminal defendant's
direct appeal, that the trial judge "at least partially
mitigated the possibly prejudicial impact of his comments by
explaining to the jury several times that his admonishments of
counsel should have no bearing on their deliberations or
determinations"). For example, the court told the jury—twice—
that the case was "not a personality contest, . . . no matter

what is said," and that it was the jury's evaluation of the
evidence that should control its verdict. Tr. at 888, 944-47.

Therefore, trial court's conduct toward defense counsel did
not deprive the petitioner of a fair trial. The Appellate
Division's rejection of this claim was neither contrary to, nor
an unreasonable application of, federal law.

## C.

Third, the petitioner argues that he was deprived of his
right to counsel of his choosing when the trial court
disqualified his initial counsel for a conflict of interest. The
Appellate Division determined that this claim was unpreserved
because there was no contemporaneous objection: when this issue
was raised, the petitioner's "original attorney made no protest
other than expressing a vague desire to look into whether the
conflict could be waived," and the petitioner himself "never
requested to continue with the conflicted attorney"; the
petitioner simply said that he wanted "a lawyer, period." Grant-
Byas, 161 N.Y.S.3d at 63. In the alternative, the Appellate
Division concluded that the trial court properly disqualified
the petitioner's original lawyer based on the "obvious" conflict
of interest. Id.

As an initial matter, this claim is procedurally barred. A
habeas court may not review a federal issue when the state court

31

relied on "a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). "[E]ven when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted." Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) (quoting Glenn v. Bartlett, 98 F.3d 721, 725 (2d Cir. 1996)). New York's contemporaneous objection rule, which requires a criminal defendant to object to a court ruling contemporaneously in order to preserve the issue for appellate review, constitutes such an independent and adequate state law ground. Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011). Accordingly, the Appellate Division's conclusion that the petitioner failed to follow the contemporaneous objection rule precludes habeas review.[6]

In any event, the Appellate Division's alternative holding that the trial court properly exercised its discretion to disqualify the petitioner's original counsel based on "the obvious conflict of interest" was not contrary to, or an

---

[6] In "exceptional cases," the "exorbitant application" of a state rule "renders the state ground inadequate to stop consideration of a federal question." Lee v. Kemna, 534 U.S. 362, 376 (2002). To determine whether a case involves an "exorbitant misapplication of a state rule," courts consider whether the application of the rule "serves a legitimate state interest." Downs, 657 F.3d at 102. In this case, the petitioner fails to advance any argument that the Appellate Division's ruling constituted an "exorbitant" misapplication of state law that served no legitimate state interest.

unreasonable application of, federal law as determined by the Supreme Court. Grant-Byas, 161 N.Y.S.3d at 63. The petitioner identifies no Supreme Court decision directly on point—namely, holding that a criminal defendant's constitutional rights are violated when counsel is disqualified because of a conflict of interest and the defendant is allegedly not given an opportunity to waive the conflict. Instead, the petitioner cites Holloway v. Arkansas, 435 U.S. 475 (1978), where the Supreme Court held that a criminal defendant has a right under the Sixth Amendment to be represented by an attorney who is free from any conflict of interest, id. at 483, and a concurrence in Morris v. Slappy, 461 U.S. 1 (1983), where Justice Brennan stated that a criminal defendant has a qualified right to representation by counsel of his choice, id. at 21-23 (Brennan, J., concurring). In fact, in Wheat v. United States, 486 U.S. 153 (1988), the Supreme Court observed that, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment," that right "is circumscribed in several important respects." Id. at 159. The Court in Wheat held that the trial court correctly denied the defendant's request for substitution where the defendant's chosen attorney had represented or was representing other defendants charged in the same criminal conspiracy. Id. at 164.

Similarly, in this case, the trial court disqualified the petitioner's original attorney because the attorney was also representing two of the petitioner's alleged victims in their prostitution cases. The two women had a complete defense to the prostitution charges if they were victims of coercion—one of the elements the prosecution needed to prove for the petitioner to be convicted of sex trafficking. S.R. at 571-74. In these circumstances, "there can be no doubt that [counsel's] potential conflict was serious, that his loyalty was divided between [clients], and that representing [the petitioner] would have created a strong appearance of impropriety." United States ex rel. Stewart v. Kelly, 870 F.2d 854, 857 (2d Cir. 1989). Moreover, nothing in the record indicates that the petitioner expressed a willingness to waive the conflict. Even if the petitioner had expressed such a preference, the trial court was not required to accept it if the attorney's conflict would "jeopardize[] the integrity of judicial proceedings." United States v. Perez, 325 F.3d 115, 125-26 (2d Cir. 2003). Accordingly, even on the merits, the petitioner is not entitled to habeas relief on this claim.

**D.**

Fourth, the petitioner contends that the trial court improperly denied his for-cause challenge to prospective juror

34

Lisa Bates, whom defense counsel subsequently removed using a peremptory challenge. According to the petitioner, he was prejudiced because he eventually exhausted his peremptory challenges. The Appellate Division held that the petitioner's claim was not supported by the record. Grant-Byas, 161 N.Y.S.3d at 63.

This claim arises under New York law. Under New York law, a for-cause challenge to a prospective juror "whose statements raise a serious doubt regarding the ability to be impartial" must be granted "unless the juror states unequivocally on the record that he or she can be fair and impartial." People v. Chambers, 766 N.E.2d 953, 955 (N.Y. 2002). The erroneous denial of a defendant's for-cause challenge constitutes reversible error only if the defendant eventually exhausts his peremptory challenges. See People v. Wright, 88 N.E.3d 303, 303–04 (N.Y. 2017); N.Y. CPL § 270.20(2).

On habeas, however, relief cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the claim violated clearly established federal law. 28 U.S.C. § 2254(d)(1). As the respondent correctly points out, "peremptory challenges are not of federal constitutional dimension." United States v. Martinez-Salazar, 528 U.S. 304, 311 (2000). Rather, the Sixth Amendment guarantees a criminal

defendant's right to a trial by an impartial jury. U.S. Const.
amend. VI. Accordingly, "[s]o long as the jury that sits is
impartial, the fact that the defendant had to use a peremptory
challenge to achieve that result does not mean the Sixth
Amendment was violated." Ross v. Oklahoma, 487 U.S. 81, 88
(1988); see also, e.g., Rodriguez v. Smith, 485 F. Supp. 2d 368,
378-79 (S.D.N.Y. 2007) ("[E]ven where a defendant has used all
of his allotted peremptory challenges to remove allegedly biased
jurors whom the trial judge has failed to remove for cause, a
defendant must still show that the jury was not impartial."). To
obtain habeas relief, therefore, the petitioner must establish
that his constitutional right to an impartial jury was violated.

    The petitioner has failed to do so. To begin, the trial
court's denial of the petitioner's for-cause challenge did not
prejudice the petitioner because that juror was not selected to
sit on the jury. See United States v. Towne, 870 F.2d 880, 885
(2d Cir. 1989) ("[A]ppellant cannot demonstrate that he was
prejudiced by the trial judge's refusal to excuse this
venireperson for cause, since Ms. Cox was never a member of the
jury that convicted [Appellant]."); see also Rodriguez, 485 F.
Supp. 2d at 379. Moreover, the petitioner makes no argument that
the jury that was ultimately selected was partial. See Towne,
870 F.2d at 885; see also Ross, 487 U.S. at 88. In fact, the

record reflects that defense counsel was satisfied with the jury that was selected. See Tr. at 275.

Nor was the trial court's decision to deny the petitioner's challenge for cause to prospective juror Bates based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). The petitioner claims that Bates expressed discomfort with defense counsel and doubted her ability to be fair. However, as the Appellate Division found, the record indicates that those statements were made by a different prospective juror, see Tr. at 196-200, who was excused for cause, see id. at 202-05. For these reasons, the petitioner's fourth claim is without merit.

**E.**

Fifth, the petitioner claims that the trial judge was biased against him because the trial judge had supervised pre-trial warrants issued in connection with the investigation in his case. See S.R. at 573 ("I know a lot about this case. I supervised the wiretaps and the takedown of this case."); Jan. 19, 2016 Tr. at 53-54 (defense counsel complaining that the trial judge "also repeatedly approved the reauthorization of [pen] registers, traces, and traps, even though [the judge was]

the trial judge in [the petitioner's] case"). The petitioner did
not raise this claim on direct appeal in state court.[7]

"Due process guarantees 'an absence of actual bias' on the
part of a judge." Williams v. Pennsylvania, 579 U.S. 1, 8 (2016)
(quoting In re Murchison, 349 U.S. 133, 136 (1955)). The
relevant inquiry is "not whether a judge harbors an actual,
subjective bias, but instead whether, as an objective matter,
the average judge in his position is likely to be neutral, or
whether there is an unconstitutional potential for bias." Id.

In this case, the petitioner has failed to show that the
trial judge's supervision of both the pre-trial proceedings and
the trial in his case resulted in an unconstitutional potential

---

[7] The respondent has not argued that this issue was not exhausted in the state
courts; indeed, the respondent has not addressed this claim at all in its
opposition papers. Because the respondent did not raise the issue of
exhaustion, this Court is not required to dismiss this claim on procedural
grounds. See Sanders v. Sullivan, 863 F.2d 218, 221–22 (2d Cir. 1988).
    In any event, for exhaustion purposes, "a federal habeas court need not
require that a federal claim be presented to a state court if it is clear
that the state court would hold the claim procedurally barred." Harris v.
Reed, 489 U.S. 255, 263 n.9 (1989). In those circumstances, the petitioner is
deemed to have no "remedies available" in the state courts and the claim is
therefore exhausted within the meaning of § 2254(b)(1). Grey, 933 F.2d at
121. In this case, because the petitioner did not raise his argument about
the trial judge's alleged bias in his direct appeal, this argument is
procedurally defaulted under New York law. See People v. Harris, 491 N.Y.S.2d
678, 682 (App. Div. 1985); N.Y. CPL § 440.10(2)(a) (barring collateral review
if an issue was determined on the merits on direct review); N.Y. CPL
§ 440.10(2)(c) (barring collateral review if a claim could have been raised
on direct review). However, while this claim is thus deemed exhausted within
the meaning of § 2254(b)(1), such a procedurally defaulted claim may be
reviewed by a federal court only "upon a showing of cause for the default and
prejudice to the petitioner." Bossett v. Walker, 41 F.3d 825, 829 (2d Cir.
1994). In this case, the petitioner has failed to show cause for the default
or prejudice, and therefore this claim is not reviewable on habeas review.
    In any event, the issue is without merit, and the claim can be
dismissed on the merits. See 28 U.S.C. § 2254(b)(2).

for bias. The petitioner relies on various cases where the Supreme Court held that due process is violated when the judge has a direct interest in the outcome. See Tumey v. State of Ohio, 273 U.S. 510, 514-15, 522-23 (1927) (reversing a conviction for unlawfully possessing intoxicating liquor where the judge was also the village mayor, who stood to get a share of any fine imposed on the defendant); In re Murchison, 349 U.S. at 134, 137 (holding that the defendant was deprived of his right to an impartial tribunal where the same judge presiding at the defendant's contempt trial had also served as the "one-man grand jury" out of which the contempt charges arose); Mayberry v. Pennsylvania, 400 U.S. 455, 463-66 (1971) (holding that a defendant charged with criminal contempt should be tried by a judge other than the one "cruelly slandered" by the contemnor); Ward v. Village of Monroeville, 409 U.S. 57, 57-59, 61-62 (1972) (finding a due process violation where the defendant was tried before a mayor who also had responsibilities for revenue production, and a major part of village income was derived from the fines imposed by the mayor in his mayor's court); Taylor v. Hayes, 418 U.S. 488, 501-02 (1974) (concluding that a judge should not have adjudicated the charges of criminal contempt that arose from a criminal trial in which the judge became "embroiled in a running controversy" with the defendant);

Williams, 579 U.S. at 8 ("[T]here is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case."). However, these cases are not on point. In this case, the trial judge is not alleged to have any "direct, personal role" or "substantial pecuniary interest" in the petitioner's prosecution. Williams, 579 U.S. at 10; Tumey, 273 U.S. at 523. There is no evidence in the record that the trial judge acted as anything other than a neutral decisionmaker in approving the warrant applications, overseeing the pre-trial proceedings, and presiding at the trial in the petitioner's case. Cf. United States v. Polanco, No. 07-cr-780, 2020 WL 4261175, at *1 (E.D.N.Y. July 24, 2020) (rejecting the petitioner's argument that the trial judge and the sentencing judge should have recused themselves because the judges had decided important witness issues, trial motions, and post-trial motions that allegedly rendered them biased).

Accordingly, the petitioner's fifth claim is without merit.

**F.**

Sixth, the petitioner argues that his sentence was excessive. The petitioner was sentenced on each of the sex trafficking counts to indeterminate terms of seven to 21 years of imprisonment, to run consecutively. See May 16, 2016

40

Sentencing Tr. at 27. On the promoting prostitution count, the petitioner was sentenced to an indeterminate term of 28 months to seven years of imprisonment, to run concurrently with the sentences imposed on the other two counts. See id.; see also S.R. at 4. The petitioner raised this claim on his direct appeal, and the Appellate Division "perceive[d] no basis for reducing the sentence." Grant-Byas, 161 N.Y.S.3d at 63.

The petitioner's claim that his sentence was excessive is without merit. It is well-established that when a sentence falls within the range prescribed by state law, the length of the sentence generally may not be raised as a basis for federal habeas relief. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."); see also Baide-Ferrero v. Ercole, No. 06-cv-6961, 2010 WL 1257615, at *4 (S.D.N.Y. Mar. 31, 2010) (collecting cases). In this case, the petitioner was convicted of two counts of sex trafficking in violation of N.Y. Penal Law § 230.34(5)(a), a Class B violent felony offense authorizing an indeterminate sentence of a minimum of five years and a maximum of 25 years in prison, see N.Y. Penal Law § 70.02(1)(a), 2, 3(a), and one count of promoting prostitution in violation of N.Y. Penal Law § 230.25(1), a Class D felony offense authorizing an

41

indeterminate sentence of imprisonment of a minimum of one year and a maximum of seven years, see id. § 70.00(2). Because the sentence imposed by the trial court falls within the statutory maximum, the petitioner's claim is not cognizable on habeas review.

The petitioner has also not shown that his sentence violates the Eighth Amendment's prohibition against "cruel and unusual punishments." U.S. Const. amend. VIII. That Amendment prohibits sentences that are "grossly disproportionate to the severity of the crime." Rummel v. Estelle, 445 U.S. 263, 271 (1980). "Rummel stands for the proposition that federal courts should be reluctant to review legislatively mandated terms of imprisonment," and therefore "successful challenges to the proportionality of particular sentences should be exceedingly rare." Hutto v. Davis, 454 U.S. 370, 374 (1982); see also Melendez v. LaValley, 942 F. Supp. 2d 419, 424 (S.D.N.Y. 2013). "A sentence within the statutory range is generally not cruel and unusual punishment," and there is nothing about the sentence imposed in this case compared to the serious crimes committed that would rise to the level of cruel and unusual punishment. Fernandez v. LaValley, No. 10-cv-7914, 2011 WL 4495302, at *3 (S.D.N.Y. Sept. 28, 2011). Accordingly, this claim is denied.

**G.**

In his reply to the respondent's opposition to his habeas petition, the petitioner raises a new claim, alleging that he was denied the effective assistance of counsel. The petitioner did not include this claim in his initial habeas petition.[8]

This new claim need not be considered because it was not included in the petitioner's initial habeas petition. Rules Governing Section 2254 Cases in the United States District Courts provide that "the petition must specify all the grounds for relief available to the petitioner." Rule 2(c)(1) of the Rules Governing Section 2254 Cases in the United States District Courts. In accordance with this Rule, courts in this Circuit have routinely held that only claims raised in a § 2254 petition itself are appropriately considered in habeas proceedings, and that claims raised solely in the petitioner's reply should not be reviewed. See, e.g., Ennis v. Artus, No. 09-cv-10157, 2011 WL 3585954, at *19 (S.D.N.Y. Aug. 12, 2011) (collecting cases), report and recommendation adopted, 2012 WL 3957046 (S.D.N.Y. Sept. 10, 2012).

In any event, the petitioner's claim is without merit. Claims of ineffective assistance of counsel are evaluated under

---

[8] There is also no indication that this claim was exhausted in state court. In any event, the claim need not be considered because it was raised for the first time in reply, and also is without merit.

the two-part test set forth in Strickland v. Washington, 466
U.S. 668 (1984). To establish ineffective assistance, the
petitioner must show both that (1) his counsel's performance was
deficient in that it was objectively unreasonable under
professional standards prevailing at the time, and (2) counsel's
deficient performance was prejudicial to the petitioner's case.
See id. at 687–88. The bar for meeting the first prong under
Strickland is "high": the petitioner must establish that his
counsel "made errors so serious that counsel was not functioning
as the counsel guaranteed by the Sixth Amendment." LanFranco v.
Murray, 313 F.3d 112, 118 (2d Cir. 2002). To satisfy the second
prong, the petitioner must show that "there is a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different. A reasonable
probability is a probability sufficient to undermine confidence
in the outcome." Strickland, 466 U.S. at 694.

   "[A] court need not determine whether counsel's performance
was deficient before examining the prejudice suffered by the
defendant as a result of the alleged deficiencies." Id. at 697.
While the petitioner now claims that his counsel was deficient
by behaving poorly, badgering witnesses, and making
inappropriate comments throughout the trial, the petitioner has
failed to establish that, but for those errors, "the result of

the proceeding would have been different." Id. at 694. The evidence that the petitioner forcibly compelled his victims to engage in prostitution was strong. There is no indication in the record that defense counsel's improper conduct influenced the jury's verdict, and in fact the trial court expressly instructed the jury on multiple occasions to focus on the law and the evidence—not on the attorneys. Therefore, the petitioner's Strickland claim is denied.

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the petition for habeas corpus is **denied**. The Clerk is respectfully directed to enter judgment dismissing the petition and closing this case.

The Court declines to issue a certificate of appealability because the petitioner has failed to make a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of

an appeal. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).

The Clerk is requested to mail a copy of this Memorandum Opinion and Order to the petitioner and to note mailing on the docket.

**SO ORDERED.**

Dated:    **New York, New York**
          **April 1, 2025**

                                            _____
                                            **John G. Koeltl**
                                            **United States District Judge**

46